1

2

3

4

5

6               IN THE UNITED STATES DISTRICT COURT

7            FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9  JOSE RUBIO-DELGADO, SHALANDA    )  Case No. 13-cv-03105-SC
   BURGESS, AND HARRIETTA HUBBARD, )
10 INDIVIDUALLY, ON BEHALF OF OTHER)  ORDER DENYING MOTION FOR
   SIMILARLY SITUATED INDIVIDUALS, )  PRELIMINARY APPROVAL OF THE
11 AND ON BEHALF OF THE GENERAL    )  PROPOSED SETTLEMENT
   PUBLIC,                         )
12                                 )
                                   )
13          Plaintiffs,            )
                                   )
14     v.                         )
                                   )
15                                 )
   AEROTEK, INC.,                  )
16                                 )
            Defendant.             )
17 _____  )

18

19

20  **I. INTRODUCTION**

21      This case involves alleged violations of the Fair Credit

22 Reporting Act ("FCRA").  See 15 U.S.C. § 1681.  Plaintiffs Jose

23 Rubio-Delgado, Shalanda Burgess, and Harrietta Hubbard purport to

24 represent a class of persons aggrieved by Defendant Aerotek, Inc.

25 ("Aerotek").  Aerotek is a recruiting and staffing agency, and

26 Plaintiffs allege that Aerotek obtained information about its

27 employees and prospective employees without proper notice and

28 authorization.  ECF No. 1 ("Compl.") ¶¶ 2, 5-10.  The parties have

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  reached a settlement agreement and now seek the Court's preliminary
2  approval.  <u>See</u> ECF No. 52 ("Mot.").  Plaintiffs have moved for
3  preliminary approval without oral argument, and the motion is
4  unopposed.

5  Upon reviewing Plaintiffs' motion, the Court had serious
6  concerns about the settlement and ordered supplemental briefing to
7  show that the proposed Settlement Agreement was not obviously
8  deficient, outside the range of possible approval, and/or the
9  result of collusive negotiations.  ECF Nos. 53 ("Suppl. Br.
10  Order"), 56 ("Pl. Suppl. Br."), 57 ("Def. Suppl. Br.").  Because
11  the parties' motion and supplemental briefs failed to adequately
12  address the Court's concerns, Plaintiffs' motion for preliminary
13  approval is DENIED.

14

15  **II.  <u>BACKGROUND</u>**

16  **A.  <u>Allegations</u>**

17  The claims in this case relate to the Defendant's disclosures
18  and authorizations regarding background checks obtained on
19  employees and job applicants.

20  The FCRA requires employers who are procuring a privately run
21  background check upon applicants or employees to provide those
22  applicants or employees with written notice that such a report may
23  be obtained for employment purposes. This notice must include "a
24  clear and conspicuous disclosure . . . in writing . . . in a
25  document that consists solely of the disclosure, that a consumer
26  report may be obtained for employment purposes."  15 U.S.C. §
27  1681b(b)(2)(A)(i).

28  Employers who procure consumer reports on job applicants and

**United States District Court**
For the Northern District of California

1  employees violate the FCRA if their disclosures include language
2  releasing the employer from liability associated with the
3  procurement of consumer reports.  See Singleton v. Dominos Pizza,
4  No. 11-1823, 2012 WL 245965, at *9 (D. Md. Jan. 25, 2012) ("[B]oth
5  the statutory text and FTC advisory opinions indicate that an
6  employer violates the FCRA by including a liability release in a
7  disclosure document"); Reardon v. Closetmaid Corp., No. 08-1730,
8  2013 WL 6231606, at *10-11 (W.D. Pa. Dec. 2, 2013) (finding that a
9  FCRA disclosure with liability waiver was "facially contrary to the
10 statute at hand, and all of the administrative guidance").
11 Employers also violate the FCRA if they provide the required
12 disclosure in a document that does not consist solely of the
13 disclosure, such as when the disclosure is integrated as part of a
14 job application.  See E.E.O.C. v. Video Only, Inc., No. CIV. 06-
15 1362-KI, 2008 WL 2433841, at *11 (D. Or. June 11, 2008) (granting
16 summary judgment against the defendant-employer who made the
17 disclosure "as part of its job application which is not a document
18 consisting solely of the disclosure").

19      To make a claim under the FCRA, Plaintiffs must prove willful
20 noncompliance with FCRA's disclosure requirements.  15 U.S.C. §
21 1681n.  Where willful noncompliance can be proven, statutory
22 damages are available in an amount of not less than $100 and not
23 more than $1,000 for each violation, plus possible punitive damages
24 and reasonable attorney's fees and costs.  Id.

25      Plaintiffs alleged in their Complaint that Aerotek "willfully
26 and systematically violated [FCRA] by procuring consumer reports on
27 Plaintiff and other putative class members for employment purposes,
28 without first making proper disclosures in the format required."

Compl. ¶ 7.  Aerotek disputes those allegations and asserts that it provided Plaintiffs with two documents that independently satisfy FCRA's disclosure requirements: (1) a one-page notice document, captioned "NOTICE TO APPLICANTS REGARDING BACKGROUND CHECKS AND EMPLOYEE INVESTIGATIONS" ("Notice") (Compl., Ex. 3); and (2) a separate one-page authorization form, entitled "AUTHORIZATION AND RELEASE FOR THE PROCURMENT OF A CONSUMER AND/OR INVESTIGATIVE CONSUMER REPORT" ("Authorization") (Compl., Ex. 2).  See Def. Suppl. Br. at 3-4.

Plaintiffs assert that neither the Notice nor the Authorization comply with FCRA.  Plaintiffs allege that the Notice violates FCRA because it includes extraneous information[1] and was provided as part of a larger job application.  Compl. ¶ 12. Plaintiffs claim that the Authorization violates FCRA because it includes a liability release.  Compl. ¶ 13.  Further, Plaintiffs allege that "Aerotek's decision to turn a document that is supposed to serve as a notice of a consumer's rights into a document which purports to serve as a waiver of those same legal rights is virtually conclusive evidence of the willfulness of Aerotek's willful violation of the FCRA."  Compl. ¶ 14.

**B.**  **Litigation History**

On July 3, 2013, Plaintiffs filed their Class Action Complaint

---

[1] Specifically, Plaintiffs' Complaint states that the Notice includes the following: (1) "A reservation of Aerotek's right to refuse to hire anyone who does not authorize a background investigation;" (2) "A statement regarding Aerotek's policy that all employees are required to cooperate with the Company's internal investigations;" (3) "A statement that employees who fail to cooperate with internal investigations will be disciplined;" and (4) "A statement encouraging all employees to report any potentially threatening or harmful behavior they observe."  Compl. ¶ 30.

against Aerotek.  On behalf of themselves and the proposed class, Plaintiffs sought statutory damages of between $100 and $1000 per violation, plus punitive damages, attorneys' fees, costs, and all other available relief.

On September 12, 2014, Defendant filed a motion for judgment on the pleadings asserting that Plaintiffs could not prove that Aerotek acted willfully -- an essential element of Plaintiffs' FCRA claim.  See generally ECF. No. 42 ("Mot. to Dismiss").  Before Plaintiffs' opposition was due, the parties agreed to a stay pending mediation.  ECF. No. 43.  The parties first attempted to mediate this matter on June 18, 2014, though that attempt was unsuccessful.  A second mediation took place on September 16, 2014, resulting in a terms sheet that served as the basis for a Settlement Agreement.

On March 5, 2015, Plaintiffs filed an unopposed motion for preliminary approval of the proposed settlement.  On April 1, 2015, the Court ordered supplemental briefing to address the Court's concerns regarding the fairness and adequacy of the Settlement Agreement, including: (1) the requirement that class members fill out a claim form in order to receive their share of the settlement even though the Defendant already had the class members' addresses and the settlement was to be distributed pro rata; and (2) the amount of the settlement given that when divided across all 588,000 class members it offers only 6.7 percent of the minimum amount recoverable and 0.67 percent of the maximum recovery.  Plaintiffs and Defendant filed their supplemental brief on April 22, 2015 and May 6, 2015, respectively.

///

### C.    Overview of the Settlement Agreement

### 1.    Settlement Class and Payment Terms

The Settlement Agreement proposes a settlement class consisting of the approximately 588,000 persons who Aerotek identified as (1) having been provided with Aerotek's disclosure form, and (2) upon whom Aerotek obtained a background report for employment purposes in the period from July 3, 2011 through the present. ECF No. 50-2 ("Settlement") ¶ 2.

The Settlement Agreement calls for Aerotek to pay $5,000,000 into a "Common Fund" without reversion to Aerotek for any reason. Settlement ¶ 27. If enough class members submit claims, however, the agreement requires Aerotek to make an additional contribution to the settlement fund, up to a maximum of $262,500, for a total of $5,262,500.

After deductions for attorneys' fees, litigation costs, settlement administration costs, and incentive awards, the Settlement Agreement instructs the Settlement Administrator to distribute the balance of funds pro rata to class members who timely return properly-completed claim forms. Id. ¶ 29. If enough class members were to claim their shares of the settlement, Aerotek would be required to make the maximum possible contribution of $5,262,500. Once the proposed attorneys' fees, incentive awards, and settlement administration costs are deducted, $3,572,476 would remain in the fund. Thus, if every class member submitted a claim, each class member would receive $6.08. The parties estimate, however, that only 15 percent of class members will complete and return claim forms, resulting in approximately $40 for each of those class members. Pl. Suppl. Br. at 7.

**United States District Court**
For the Northern District of California

### 2. Injunctive Relief

As part of the Settlement Agreement, the parties submitted a proposed "Injunctive Relief Order." Settlement ¶ 32. The proposed order states that "Aerotek will refrain from including any liability release in the disclosure forms it provides to applicants or employees prior to procuring background checks." Id., Ex. H ¶ 2. The proposed order also provides that Aerotek shall use a specified disclosure form; however, the order states that "Defendant shall retain the right to modify the text in [the proposed disclosure form] in order to effect revisions for compliance and other business purposes so long as Aerotek believes in good faith that the form used remains legally compliant with the Fair Credit Reporting Act." Id. ¶¶ 2-3.

### 3. Attorneys' Fees and Costs

The Settlement Agreement provides for Plaintiffs' lawyers to recover up to 25 percent of the settlement -- $1,315,625. Id. ¶ 33.

### 4. Incentive Payment

The Settlement Agreement indicates that the parties have agreed to pay a total of $5,000 from the settlement fund to the three named plaintiffs -- specifically, $3,000 to Plaintiff Rubio-Delgado and $1,000 each to Harrietta Hubbard and Shalanda Burgess.[2] Id. ¶ 34.

### 5. Releases

Class members who have not timely and properly opted out of the settlement class will release all claims arising under the FCRA,

---

[2] The parties attach a First Amended Complaint as exhibit A to their proposed Settlement Agreement. They request leave to file the First Amended Complaint in order to add Harrietta Hubbard and Shalanda Burgess as named plaintiffs. Settlement Agreement ¶ 1.

**United States District Court**
For the Northern District of California

1  with the exception of individual claims for actual damages based on

2  failure to provide pre-adverse-action notice.  Settlement ¶¶ 40-42.

3  **6.    Procedure for Claims and Settlement**

4  The "Short Form Class Notice and Claim Form"--a double-sided

5  postcard with prepaid postage--will apprise class members of the

6  existence of the settlement and provide them with a means to file a

7  claim.  Id. ¶¶ 6, 11, Ex. B.  In order to receive their share,

8  class members must complete and return the postcard with the

9  following information: current name, former name, address,

10  telephone number, email address, the last four digits of the class

11  member's social security number, and a certification under penalty

12  of perjury that all information on the form is true and correct.

13  Id. ¶ 16.  In order to receive a settlement check, the postcard

14  must be completely and accurately filled out and postmarked no

15  later than 60 days after the Settlement Administrator mails the

16  postcard to the class members.  Id. ¶ 17.  The Settlement

17  Administrator will determine the amount of payment to be disbursed

18  pro rata based on the number of class members who submit a timely

19  claim form.

20  **7.    Unclaimed Settlement Funds**

21  Settlement checks issued to class members will expire 150 days

22  after they are issued.  Id. ¶ 36.  Any undelivered checks, returned

23  checks, uncashed checks, or non-negotiated checks will be returned

24  to the settlement fund.  Any amount remaining in the Settlement

25  Fund will be redistributed to individuals who negotiated their

26  initial settlement check.[3]  If there are funds remaining after the

27  ─────────────

[3] Redistribution will only occur if the amount remaining would
28  result in class members receiving at least an additional $10 each.

redistribution, they will be donated to the parties' <u>cy pres</u> organization, the National Consumer Law Center. <u>Id.</u> ¶¶ 37-38.

### 8. <u>Objections</u>

Any class member who wishes to object to the settlement must do so no later than 60 days following the mailing of the Short Form Class Notice and Claim Form by filing a written statement of objection with the Court stating the factual and legal basis for the objection as well as other information. <u>Id.</u> ¶ 24.

## III. <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 23(e) requires judicial approval of any settlement by a certified class and demands that the settlement be "fair, reasonable, and adequate." When evaluating a class settlement agreement that applies to a class, courts may consider some or all of the following factors:

> [1] the strength of plaintiffs' case; [2] the risk, expense, complexity, and likely duration of further litigation; [3] the risk of maintaining class action status throughout the trial; [4] the amount offered in settlement; [5] the extent of discovery completed, and the stage of the proceedings; [6] the experience and views of counsel; [7] the presence of a governmental participant; and [8] the reaction of the class members to the proposed settlement.

<u>Rodriguez v. W. Publ'g Corp.</u>, 563 F.3d 948, 963 (9th Cir. 2009).

At the preliminary approval stage, however, the Court need not make a final determination as to the fairness, reasonableness, and adequacy of the settlement. Instead, the Court may grant preliminary approval of a settlement if the settlement agreement

///

---

Otherwise, the remaining funds will be donated to the parties' <u>cy pres</u> organization.

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1  (1) appears to be the product of serious, informed, non-
2  collusive negotiations; (2) has no obvious deficiencies;
   (3) does not improperly grant preferential treatment to
   class representatives or segments of the class; and (4)
3  falls within the range of possible approval.

4  Harris v. Vector Mktg. Corp., No. C-08-5198 EMC, 2011 WL 1627973,

5  at *7 (N.D. Cal. Apr. 29, 2011); see also Joseph M. McLaughlin,

6  McLaughlin on Class Actions: Law and Practice § 6.6 (7th ed. 2011)

7  ("Preliminary approval is an initial evaluation by the court of the

8  fairness of the proposed settlement, including a determination that

9  there are no obvious deficiencies such as indications of a

10 collusive negotiation, unduly preferential treatment of class

11 representatives or segments of the class, or excessive compensation

12 of attorneys . . . .").

13

14 **IV.  DISCUSSION**

15     **A.   The Settlement Process**

16     The Court first examines the means by which the parties

17 arrived at settlement. "An initial presumption of fairness is

18 usually involved if the settlement is recommended by class counsel

19 after arm's-length bargaining." Riker v. Gibbons, No. 3:08-cv-

20 00115-LRH-VPC, 2010 WL 4366012, at *2 (D. Nev. Oct. 28, 2010)

21 (citing 4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions

22 § 11:42 (4th ed.2002)).

23     The settlement in this case was the product of two day-long

24 mediation sessions held before an experienced mediator, Professor

25 Eric Green.  See generally ECF. No. 56-4 ("Green Decl.").  The

26 parties conducted informal pre-mediation discovery, and exchanged

27 mediation briefs setting out their respective positions.  Mot. at

28 2.  As part of this process, Defendant produced, and Plaintiff

**United States District Court**
For the Northern District of California

1  reviewed, over 500 pages of documents.  Id.  The first mediation

2  session was held on June 18, 2014.  This first mediation was

3  unsuccessful.  Id.

4      After failing to come to an agreement, Plaintiff served a

5  number of discovery requests upon Defendant.  Id.  The parties then

6  agreed to mediate for a second time on September 16, 2014, again

7  with mediator Green.  Id.  After a full day of negotiations, the

8  parties reached an agreement as to the material terms of a

9  settlement.  Id.

10     After reviewing the parties' briefs and supplemental papers,

11 including Professor Green's declaration, the Court concludes that

12 the settlement was the result of extensive, arms'-length

13 negotiations between the parties after some discovery, motion

14 practice, and pre-trial preparation.  Further, "[t]he assistance of

15 an experienced mediator in the settlement process confirms that the

16 settlement is non-collusive."  Satchell v. Fed. Exp. Corp., No. C

17 03-2659 SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007); see

18 also Carter v. Anderson Mech., LP, 2010 WL 1946784, at *7 (C.D.

19 Cal. May 11, 2010); Green Decl. ¶¶ 1-12 (detailing mediator Green's

20 experience and the arms-length nature of the mediation).

21     **B.  The Presence of Obvious Deficiencies**

22     The second factor the Court considers is whether there are

23 obvious deficiencies in the Settlement Agreement.  Plaintiff

24 asserts that the settlement does not contain any "deficiencies

25 which can stand in the way of judicial approval."  Mot. at 18.

26 Specifically, Plaintiffs note that the totality of the settlement

27 will be paid out without reversion to the Defendant; deductions

28 such as attorneys' fees, administrative expenses, and Named

**United States District Court**
For the Northern District of California

1   Plaintiff service awards require judicial approval; and the
2   settlement is not contingent upon approval of the requested
3   amounts.  Mot. at 18-19.  Nevertheless, the Court has serious
4   concerns.

            **1.    Claim Forms**

6       The Settlement Agreement requires class members to complete a
7   claim form in order to receive their share of the settlement.
8   There is nothing inherently objectionable about requiring a claim
9   form.  However, where requiring a claim form imposes unnecessary
10  costs or limits the number of class members who will receive a
11  settlement, some justification is required before the Court will
12  grant preliminary approval.  See Sullivan v. DB Invs., Inc., 667
13  F.3d 273, 319 (3d Cir. 2011) (stating that "trial judges bear the
14  important responsibility of protecting absent class members");
15  Maywalt v. Parker & Parsley Petroleum Co., 67 F.3d 1072, 1078 (2d
16  Cir. 1995) (noting that "the district court has a fiduciary
17  responsibility" to the class); Fed. Judicial Ctr., Managing Class
18  Action Litig.: A Pocket Guide for Judges, 30 (3d ed. 2010) ("If the
19  claims process deters class members from filing claims, the
20  settlement may have less value to the class than the parties assert
21  . . . Avoid imposing unnecessary hurdles on potential claimants.
22  First, consider whether a claims process is necessary at all.  The
23  defendant may already have the data it needs to automatically pay
24  the claims of at least a portion of class members who do not opt
25  out."); 2 McLaughlin on Class Actions § 6:23 (11th ed. 2014) ("In
26  addition to ensuring a higher level of class member participation
27  in the recovery, eliminating the claim form reduces costs of
28  administration, and may increase the fee awarded.").

**United States District Court**
For the Northern District of California

1     In this case, requiring a claim form will reduce the amount

2    available to the class given the cost of producing, processing, and

3    purchasing prepaid return postage for 588,000 forms. Furthermore,

4    only about 15 percent of eligible class members will receive their

5    share of the settlement as a result of requiring a claim form. Pl.

6    Suppl. Br. at 14. To be sure, courts have approved settlements

7    requiring class members to submit claim forms where class members

8    were difficult to identify or where calculating each class member's

9    share of the settlement required information the parties did not

10    have. See, e.g., Trombley v. Nat'l City Bank, 759 F. Supp. 2d 20,

11    25-26 (D.D.C. 2011) (finding claim forms appropriate where the

12    share of damages could not be calculated without additional

13    information from class members). However, neither concern is at

14    issue here. Class members are readily identifiable from Aerotek's

15    records, and each class member's share is simply a pro rata portion

16    of the settlement fund (after costs, fees, etc. are deducted).

17     After reviewing Plaintiffs' motion and the parties'

18    supplemental briefing on the issue, the Court finds the parties'

19    justifications unconvincing. In their motion for preliminary

20    approval, Plaintiffs argue that a claim form is appropriate for

21    three reasons:

22       First, use of the Claim Form helps to ensure that all
           class members will have the opportunity to receive a
23       share of the settlement . . . . Second, the Claim Form in
           this case is not unduly burdensome . . . . Third and
24       finally, there is no reversion of any settlement funds to
           the Defendant.
25

26   Mot. at 19.

27     It is entirely unclear how, as compared to simply sending a

28    check, a claim form "helps to ensure that all class members have

**United States District Court**
For the Northern District of California

1   the opportunity to receive a share of the settlement." <u>Id.</u>

2   Plaintiffs assert that "[g]iven the brevity of Defendant's

3   interaction with many members of the class, many class members may

4   not be inclined to negotiate their checks, or their addresses may

5   be outdated." <u>Id.</u> Even if that were true, the claim form will not

6   increase the number of class members who are inclined to negotiate

7   their checks, nor will it provide the Settlement Administrator with

8   updated addresses. On the contrary, it is likely to significantly

9   reduce the number class members who receive a settlement payment.[4]

10      Plaintiffs urge the Court to approve the Settlement Agreement

11  because the claim form is not unduly burdensome. The Court agrees

12  that the claim form does not place a significant burden on class

13  members in terms of the effort required to submit a claim. Many

14  class members may be reluctant to send their personal information

15  through the mail on a postcard, however. Moreover, whether the

16  burden on class members is undue depends, in part, on the

17  underlying justification for requiring the claim form in the first

18  place. Insofar as a claim form is unnecessary, the burden, while

19  low, can still be undue.

20      Finally, Plaintiffs' motion argues that the parties have no

21  incentive to make the claims process more onerous than necessary

22  because funds that are not claimed will be donated as opposed to

23  reverted to the Defendant. The Court agrees that this is an

24  important consideration, but it disagrees that there is no other

25  _____

    [4] The proposed claim form requires class members to submit their
26  personal information -- including the last four digits of their
    Social Security number -- through the mail on a postcard that can
27  be easily viewed by anyone who comes into contact with it. This is
    sufficiently burdensome that the parties estimate that only 15
28  percent of class members will return them. Pl. Suppl. Br. at 14.

**United States District Court**
For the Northern District of California

1  incentive to drive down the claims rate.  The parties have asked

2  the Court to evaluate the adequacy of the settlement assuming that

3  class members will receive approximately $40 each.  Pl. Suppl. Br.

4  at 14.  A $40 award is only possible under the terms of the

5  Settlement Agreement, however, if one assumes a claims rate of 15

6  percent.  In order to keep the claims rate as low as 15 percent,

7  however, claim forms are necessary.

8      In their supplemental brief, Plaintiffs provide several

9  examples of courts approving settlements requiring claim forms.

10  The claim forms in the cited cases, however, were clearly justified

11  and/or outweighed by other considerations that do not apply here.

12  See Shames v. Hertz Corp., No. 07-CV-2174-MMA WMC, 2012 WL 5392159,

13  at *12 (S.D. Cal. Nov. 5, 2012) ("The actual intent of the claims

14  process is to allow class members the opportunity to choose between

15  several payment options."); Weeks v. Kellogg Co., No. CV 09-08102

16  MMM RZX, 2013 WL 6531177, at *4 (C.D. Cal. Nov. 23, 2013)

17  (approving the use of a claim form where the defendant did not

18  already have class members' addresses); Arthur v. Sallie Mae, Inc.,

19  No. C10-0198JLR, 2012 WL 90101, at *4 (W.D. Wash. Jan. 10, 2012)

20  (approving the use of a claim form where the defendant did not have

21  class members' addresses and the intent of form was to allow class

22  members to choose between settlement options); Schulte v. Fifth

23  Third Bank, 805 F. Supp. 2d 560, 590-91 (N.D. Ill. 2011) (approving

24  the use of a claim form where additional information was needed in

25  order for the claims administrator to process claims); Trombley,

26  759 F. Supp. 2d at 28 (same); Milliron v. T-Mobile USA, Inc., No.

27  CIV.A. 08-4149 (JLL), 2009 WL 3345762, at *6 (D.N.J. Sept. 10,

28  2009), as amended (Sept. 14, 2009), aff'd, 423 F. App'x 131 (3d

1  Cir. 2011) (same); Lemus v. H & R Block Enter. LLC., No. C 09-3179
2  SI, 2012 WL 3638550, at *5 (N.D. Cal. Aug. 22, 2012) (granting
3  final approval notwithstanding the claims-made nature of the
4  settlement because a significant portion of the class participated
5  and the average class member's recovery was at least $1,200.80).

6       Plaintiffs again argue in their supplemental brief that
7  "requiring claim forms is perfectly justified . . . [b]ecause . . .
8  there is doubt as to whether Defendant has current contact
9  information" due to the "transitory nature" of class members'
10 interactions with Defendant. Pl. Suppl. Br. at 12-13. Plaintiffs
11 fail to explain, however, why a "transitory" interaction is more
12 likely to yield inaccurate addresses. Addresses were provided to
13 the Defendant relatively recently -- "from July 3, 2011 through the
14 present." Settlement ¶ 2. It seems unlikely, therefore, that a
15 significant number of checks would go undelivered or mis-delivered.
16 Regardless, to the extent that the accuracy of addresses is an
17 issue, the Court fails to see how claim forms are an effective
18 remedy. Mailing claim forms would not increase the likelihood that
19 the intended class members would receive their share of the
20 settlement. Moreover, undelivered or mis-delivered checks can
21 simply be redistributed according to the provisions of the
22 settlement plan. See Settlement ¶¶ 36-38.

23      Finally, Plaintiffs argue that increasing the number of class
24 members who receive a settlement payment by simply mailing checks
25 to the 588,000 class member addresses on record "would not be the
26 best way to administer the settlement" because it would result in
27 class members receiving checks of less than $10, which are unlikely
28 to be cashed. Pl. Suppl. Br. at 13 n.6. This is undesirable

**United States District Court**
For the Northern District of California

1  according to the Plaintiffs because it will result in the class
2  incurring the cost of a second distribution.  Id.  Intentionally
3  reducing the number of class members who receive a payment by
4  requiring them to jump through unnecessary hoops, however, is a
5  highly dubious means of reducing costs.  All else equal, the goal
6  should be to distribute settlement payments to as many class
7  members as possible.  Moreover, even if the Court were to assume
8  that mailing checks to every class member would result in a second
9  distribution (and that mailing claim forms first would prevent a
10  second distribution), mailing checks directly would eliminate other
11  costs, including the cost of printing, processing, and purchasing
12  prepaid return postage for thousands of claim forms.

13      Similar FCRA class action settlements involving employers who
14  had applicants' addresses on file have not required class members
15  to fill out and return a claim form.  See, e.g., Motion for
16  Preliminary Approval of Class Action Settlement at 8, Ford v. CEC
17  Ent., Inc., No. 14-00677-JLS-JLB (S.D. Cal.), ECF No. 36 ("All
18  Class Members are entitled to receive a check for approximately $38
19  without having to submit a claim form."); Settlement Agreement at
20  13, Brown v. Delhaize Am., LLC, No. 14-00195-TDS-JLW (M.D.N.C.) ECF
21  No. 65-2 ("The Net Settlement Fund will be distributed pro rata in
22  the form of a check to each member of the Settlement Classes.").
23  Here, a claim form will result in additional costs to the class
24  while reducing the number of class members who will receive a
25  settlement payment.  In the absence of any reason to require a
26  claim form other than to inflate the appearance of an adequate pro
27  rata settlement amount, the Court cannot grant preliminary
28  approval.

**United States District Court**
For the Northern District of California

### 2. Attorneys' Fees

The Court's fiduciary duty to protect the interests of the class is especially important when the interests of the class and its counsel negotiating on its behalf are not aligned. See Reynolds v. Beneficial Nat'l Bank, 288 F.3d 277, 279-80 (7th Cir. 2002) (stating that the problem that class counsel "may, in derogation of their professional and fiduciary obligations, place their pecuniary self-interest ahead of that of the class . . . requires district judges to exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions"). This is particularly true when reviewing the reasonableness of proposed attorneys' fees. See, e.g., Pokorny v. Quixtar Inc., No. 07-0201-SC, 2011 WL 2912864, *1 (N.D. Cal. July 20, 2011) (examining the reasonableness of attorneys' fees at the preliminary approval stage and requiring additional information including documentation of attorney and staff hours and billing rates before approval was granted).

There has been very little litigation in this case. Moreover, the settlement provides less than $6.08 per class member. Nevertheless, the Settlement Agreement authorizes Plaintiffs' counsel to petition the Court for up to $1,315,625 in attorneys' fees. The Ninth Circuit has established 25 percent of a common fund as a benchmark award for attorneys' fees. See Larsen v. Trader Joe's Company, No. 11-cv-05188-WHO, 2014 WL 3404531, *9 (N.D. Cal. July 11, 2014). The proposed amount falls within that benchmark, but upon a motion for attorneys' fees, the Court would likely require additional evidence to show that the proposed fees are reasonable in light of the litigation conducted and the settlement's benefit to the class.

**United States District Court**
For the Northern District of California

### C.   **Preferential Treatment**

1

2      Under the third factor, the Court examines whether the

3   Settlement Agreement provides preferential treatment to any class

4   member.  Here, the settlement agreement calls for the certification

5   of a single class, with no sub-classes.  Every class member will be

6   treated equally, and have an equal opportunity to claim a <u>pro rata</u>

7   share of the settlement fund.

8      The settlement also calls for service awards for the Named

9   Plaintiffs -- $3,000 to Plaintiff Rubio-Delgado and $1,000 each to

10   Harrietta Hubbard and Shalanda Burgess.  The Ninth Circuit has

11   recognized that service awards to named plaintiffs in a class

12   action are permissible and do not render a settlement unfair or

13   unreasonable.  <u>See Stanton v. Boeing Co.</u>, 327 F.3d 938, 977 (9th

14   Cir. 2003); <u>Rodriguez v. W. Publ'g Corp.</u>, 563 F.3d 948, 958-69 (9th

15   Cir. 2009); <u>but see Chavez v. Lumber Liquidators</u>, No. 09-cv-4812,

16   2015 WL 2174168, at *3 (N.D. Cal. May 8, 2015) (denying preliminary

17   approval when the incentive award made up 7 percent of the entire

18   settlement pool).  The service awards in this case are subject to

19   the Court's review and approval.  If preliminary approval had been

20   granted, the Court would determine what portion of the service

21   awards is actually justified based on evidence of Plaintiffs'

22   involvement in this case.  <u>See W. v. Circle K Stores, Inc.</u>, No.

23   CIV. S-04-0438-WBS-GGH, 2006 WL 1652598, at *12 (E.D. Cal. June 13,

24   2006).  At this stage, however, the Court is not concerned that the

25   Settlement Agreement provides preferential treatment to any class

26   member given that it only represents 0.1% of the total settlement

27   amount.

28   ///

**United States District Court**
For the Northern District of California

1    **D.    Whether the Settlement Falls Within the Range of Possible**

2         **Approval**

3         Finally, the Court must consider whether the Settlement

4    Agreement falls within the range of possible approval. "To evaluate

5    the range of possible approval criterion, which focuses on

6    substantive fairness and adequacy, courts primarily consider

7    plaintiffs' expected recovery balanced against the value of the

8    settlement offer." Vasquez v. Coast Valley Roofing, Inc., 670 F.

9    Supp. 2d 1114, 1125 (E.D. Cal. 2009) (internal quotations omitted).

10   Additionally, to determine whether a settlement is fundamentally

11   fair, adequate, and reasonable, the Court may preview the factors

12   that ultimately inform final approval: (1) the strength of the

13   plaintiffs' case; (2) the risk, expense, complexity, and likely

14   duration of further litigation; (3) the risk of maintaining class

15   action status throughout the trial; (4) the amount offered in

16   settlement; (5) the extent of discovery completed and the stage of

17   the proceedings; (6) the experience and views of counsel; (7) the

18   presence of a governmental participant; and (8) the reaction of

19   class members to the proposed settlement. In re Bluetooth Headset

20   Prods. Liab. Litig. (In re Bluetooth), 654 F.3d 935, 943 (9th Cir.

21   2011) (citing Churchill Village v. Gen. Elec., 361 F.3d 566, 575

22   (9th Cir. 2004)).  Although the Court undertakes a more in-depth

23   investigation of the foregoing factors at the final approval stage,

24   these factors inform whether the Settlement Agreement falls within

25   the "range of possible approval."

26        **1.    Comparison of Expected Recovery with Settlement**

27        The Court first considers the classes' expected recovery

28   balanced against the value of the settlement offer.  The Ninth

**United States District Court**
For the Northern District of California

1  Circuit and several district courts have held that a court should
2  measure the expected recovery at trial based on "the 'maximum
3  amount of damages recoverable in a successful litigation.'"
4  <u>Harris</u>, No. C-08-5198-EMC, 2011 WL 1627973, at *11 (quoting <u>Glass</u>
5  <u>v. UBS Fin. Serv., Inc.</u>, No. 2007 WL 221862, at *4 (N.D. Cal. Jan.
6  26, 2007)); <u>In re Mego Fin. Corp. Sec. Litig.</u>, 213 F.3d 454, 459
7  (9th Cir. 2000)).  At this stage in the analysis, "[t]he maximum
8  amount of damages if Plaintiffs are successful at trial is not
9  discounted by the litigation risk."  <u>Id.</u>  This figure "serves as a
10  comparative base, reflecting the full verdict value if the
11  Plaintiff class were successful at trial."  <u>Id.</u>

12  Plaintiffs' claim for relief seeks $100 to $1,000 for each
13  violation of FCRA.  <u>See</u> Compl. ¶ 60.  Those amounts are based on
14  the statutory damages provided for by FCRA.  <u>See</u> 15 U.S.C. §
15  1681n(a)(1)(A).  Plaintiffs also seek punitive damages, costs, and
16  attorney's fees.  Compl. ¶¶ 61-62.  Aerotek's records indicate that
17  the number of class members is about 588,000.  Settlement Agreement
18  at ¶ 2.  Thus, even if one were to discount Plaintiffs' claims of
19  punitive damages and attorneys' fees and costs, "the maximum amount
20  of damages if Plaintiffs are successful at trial" would be $1,000
21  per class member, for a total of $588,000,000, assuming only one
22  violation per class member.

23  The parties assert that comparing the settlement with the
24  maximum amount of damages recoverable in a successful litigation is
25  inappropriate in light of the Plaintiffs' litigation risks and
26  other factors which make it highly unlikely that plaintiffs would
27  receive the maximum amount of damages.  Pl. Suppl. Br. at 7.
28  Plaintiffs' litigation risks are of course relevant to the Court's

1  ultimate determination.  The parties are incorrect that litigation

2  risks are relevant at this stage of the analysis, however.

3  Accordingly, the Court finds that the expected recovery is

4  $588,000,000, or $1,000 per class member.

5      Next, the parties argue that the Court should compare

6  Plaintiffs' pro rata expected recovery at trial with the pro rata

7  expected payment to each class member who completes and returns a

8  claim form.  The parties estimate that only 15 percent of class

9  members will complete and return a claim form.  Mot. at 20;

10  Settlement Agreement Ex. C at 4.  If only 15 percent of class

11  members receive a settlement payment, each of those class members

12  will receive approximately $40.  Id.  This is 4 percent of the

13  maximum amount of statutory damages recoverable in a successful

14  litigation and 40 percent of the minimum.  The parties' proposed

15  comparison, however, is inappropriate because it effectively

16  inflates the pro rata settlement value by the "leakage resulting

17  from a claims process where less than all members file claims."

18  Harris, 2011 WL 1627973, at *11.

19      Both the expected recovery at trial and the expected

20  settlement payment must be based on the same number of class

21  members (588,000).  The total expected recovery is $588,000,000.

22  The total settlement value ($5,262,500), less attorneys' fees

23  ($1,315,625), incentive payments ($5,000), and settlement

24  administration costs ($369,999), is $3,572,476.  The total

25  settlement value is therefore 0.61 percent of the expected

26  recovery.  Even if one were to calculate the expected recovery

27  based on the minimum statutory damages amount of $100 per

28  violation, the total settlement value would still only be 6.07

**United States District Court**
For the Northern District of California

1  percent of the expected recovery, even less once settlement

2  administration costs are deducted.

3              **2.**    <u>**Other Factors**</u>

4       Although the proposed settlement is only a small percentage of

5  the total expected recovery at trial, "there is no reason, at least

6  in theory, why a satisfactory settlement could not amount to a

7  hundredth or even a thousandth part of a single percent of the

8  potential recovery." <u>In re Ionosphere Clubs, Inc.</u>, 156 B.R. 414,

9  427 (S.D.N.Y. 1993). Whether a settlement that is between 0.67

10  percent and 6.7 percent of the expected recovery is within the

11  range of possible approval depends on the strength of the

12  plaintiffs' case; the risk, expense, complexity, and likely

13  duration of further litigation; the risk of maintaining class

14  action status throughout the trial; the extent of discovery

15  completed and the stage of the proceedings; and the experience and

16  views of counsel. <u>In re Bluetooth</u>, 654 F.3d at 943. The parties

17  have identified several reasons why the proposed settlement amount

18  might be reasonable, including several weaknesses in the

19  Plaintiffs' case. Because preliminary approval is being denied due

20  to deficiencies in the Settlement Agreement, however, the Court

21  declines to examine the merits of Plaintiffs' case at this stage

22  given the potential impact on future negotiations and/or

23  litigation.

24  ///

25  ///

26  ///

27  ///

28  ///

United States District Court
For the Northern District of California

1  **V.  CONCLUSION**

2      For the reasons given herein, Plaintiffs' Motion for

3  Preliminary Approval of the Proposed Settlement is DENIED.

4

5      IT IS SO ORDERED.

6

7      Dated: June **F€**, 2015          

8                                    UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28